## ALLISON v. CRUMMEY et al.

(Two Cases.)

No. 7393—Opinion Filed Sept. 12, 1916.

On Rehearing, June 6, 1917.

(166 Pac. 691.)

(Syllabus by the Court.)

**1. Indians — Allotments — Restriction of Alienation—Removal.**

All restrictions upon the alienation of the allotments of minor allottees of the Five Civilized Tribes having less than half Indian blood, and the restrictions upon the alienation of all lands except homesteads of said allottees, enrolled as mixed blood Indians of half or more than half, and less than three-quarters, Indian blood, are removed by Act Cong. May 27, 1908, c. 199, 35 Stat. 312, pt. 1.

**2. Same—Validity of Deed.**

A deed executed by a minor allottee of said tribes, whose restrictions have been removed by said act, to his allotted lands, is void, and title thereto can only be obtained through proceedings in the county court as provided by the statutes of this state.

**3. Guardian and Ward—Sale of Ward's Land—Fraud—Setting Aside Sale.**

Where a guardian sells the lands of his ward, upon a secret understanding that the purchaser shall not pay for same and the sale is confirmed by the court and deed executed and delivered to the purchaser, such facts constitute a fraud upon the estate of the ward, and the sale may be set aside in an action by the ward against said purchaser, or any other person who acquires rights in said lands with notice of such secret fraud.

**4. Same—Sale of Ward's Estate—Purchase by Guardian.**

A guardian cannot, directly or indirectly, purchase any property belonging to the estate of his ward, nor must he be interested in any sale thereof.

**5. Same—Sale of Ward's Land—Validity.**

A sale by a guardian of real estate belonging to his ward to himself through the interposition of a third person is not void absolutely, but is voidable in an action brought to set aside same as against the purchaser or guardian or some one claiming under him with knowledge of the circumstances of the sale, or one who was not a bona fide purchaser or incumbrancer for good and sufficient consideration and without notice.

**6. Principal and Agent—Relation—Agency for Loan Company.**

One who on behalf of a loan company takes applications for loans and sends them to the company, who passes upon the application and the security offered and then sends to such person notes and mortgages to be executed by the borrower, which is done

under the supervision of such person, and returned to the loan company, who thereupon sends a check for the amount of the loan to that person to be delivered to the borrower, is the agent of the loan company.

### 7. Same—Knowledge of Agent—Imputation to Principal.

Where the agent of a loan company performing the duties set out in the preceding paragraph of this syllabus obtains notice or knowledge of fraud in a guardian's sale of a minor's lands, such notice or knowledge will be imputed to his principal, where obtained by the agent prior to the payment of the sum loaned to the borrower.

### 8. Mortgages—Sale of Ward's Land—Nonpayment—Notice to Mortgagee of Nonpayment of Price.

Where an order of sale directs a guardian to sell lands of his ward for cash and same are sold for a sum to be paid in cash upon confirmation of the sale by the court, and the execution and delivery of a guardian's deed, and a loan company takes a mortgage upon said lands from the purchaser six days before the sale is confirmed and guardian's deed executed and delivered, said company is charged with notice apparent upon the face of the record that the purchase price of said lands has not been paid.

### 9. Same.

Though a second mortgage be subsequently taken and the first mortgage released because title to ten acres of land embraced therein is not good, this will not relieve the loan company of the consequences of the notice imputed to it at the time the first mortgage was taken.

Error from District Court, Jefferson County; Frank M. Bailey, Judge.

Suit by Josie Allison against George W. Crummey, Deming Investment Company, E. E. Ford, and others, consolidated with suit by Wade Allison, by next friend, against the same defendants. Judgment for defendants Deming Investment Company and E. E. Ford, and plaintiffs bring error. Reversed, and cause remanded.

J. B. Moore, for plaintiffs in error.

Cottingham & Hayes, Bridges & Vertrees, H. A. Kroeger, and Charles B. Mitchell, for defendants in error.

HARDY, J. George W. Crummey, as guardian of his minor stepchildren, Wade Allison and Josie Allison, sold under order of the county court of Jefferson county certain lands of his wards to one Joseph T. Dillard for a consideration to be paid in cash upon the execution and delivery of deeds to purchaser. Deeds were executed and delivered, but no consideration was paid at the time. Dillard executed mortgages upon said premises to the Deming Investment Company

and to E. E. Ford, and afterwards executed a deed to one Nick Souse, who conveyed the lands to Crummey, the guardian. Josie Allison in her own right, and Wade Allison, by next friend, brought suit for possession of the lands alleged to belong to them, respectively, and a trial resulted in judgment for defendants Deming Investment Company and E. E. Ford, and plaintiffs bring error.

The plaintiffs were both minors at the time of the guardianship proceedings in which the sales were had, and were of one-half Chickasaw Indian blood, and it is contended that the lands in controversy, which were the surplus portion of their allotments, were restricted from alienation, and that such restriction could only be removed and valid conveyances made thereto through proper proceedings in the county court. The regularity of the probate proceedings is not questioned save in this: That a sale was authorized for cash, and the order of confirmation directed the execution and delivery of deeds upon the payment in cash of the sum bid, and that a deed was in fact executed without requiring the payment of said bid or any part thereof, and it is argued that by reason thereof the restrictions upon the alienation of said lands have not been removed, and the deeds executed thereto are void, and no title passed thereunder, and all subsequent conveyances are likewise invalid. Section 1 of the act of Congress of May 27, 1908, is in part as follows:

"That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads of said allottees enrolled as intermarried whites, as freedmen, and as mixed blood Indians having less than half Indian blood including minors shall be free from all restrictions. All lands, except homesteads, of said allottees enrolled as mixed blood Indians having half or more than half and less than three-quarters Indian blood shall be free from all restrictions."

Section 2 of said act is in part as follows:

"* * * And provided further, that the jurisdiction of the probate courts of the state of Oklahoma over lands of minors and incompetents shall be subject to the foregoing provisions, and the term minor or minors, as used in this act, shall include all males under the age of twenty-one years and all females under the age of eighteen years."

Section 6 provided:

"That the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise provided by law, be subject to the jurisdiction of the probate courts of the state of Oklahoma. * * *"

And it is further provided in said section that:

"Provided [further], that no restricted lands of living minors shall be sold or incumbered, except by leases authorized by law, by order of the court or otherwise."

Section 5 declares void any attempted alienation or incumbrance of allotted lands prior to the removal of restrictions therefrom. Sections 1, 2, and 6 of said act were considered in Jefferson v. Winkler, 26 Okla. 653, 110 Pac. 755, and it was there held that:

"By reason of sections 1, 2, and 6 of said act of May 27, 1908, c. 199, 35 Stat. 312, pt. 1, the restrictions on the alienation of the allotments of minor freedmen and minor Indians of the Creek Tribe of Indians having less than half Indian blood are removed, and allotments of such allottees may be sold under the order and supervision of the probate courts of the state."

The act applies to all Five Civilized Tribes, and this construction of its terms would be equally applicable to plaintiffs. It was said in Tirey v. Darneal, 37 Okla. 606, 133 Pac. 614, that section 6 of the act of Congress of May 27, 1908, was in the nature of a restriction upon the alienation of lands belonging to minor allottees which could only be removed in a regular proceeding as provided by statute through the instrumentality of the county court, and that a deed executed by a minor, even though married, without an attempt to comply with said law, was void. In Truskett v. Closser, 236 U. S. 223, 35 Sup. Ct. 385, 59 L. Ed. 549, the Supreme Court of the United States approved the decisions of this court in Jefferson v. Winkler, and in Tirey v. Darneal, and counsel, taking these decisions as a premise, argue that because the consideration was not paid for said lands, the proceedings resulting in the sale thereof were not regular, and therefore the restrictions upon the alienation thereof were not removed and no title passed. This position is based upon the proposition that the restrictions upon the alienation of said lands were not removed by the act of Congress of May 27, 1908, and could only be removed through the medium of probate proceedings resulting in a sale thereof, which must be regular in every requirement. Section 1 of said act specifically declares that restrictions upon the alienation of lands of the class here involved are removed by said act, and jurisdiction to decree a sale thereof is conferred upon the probate courts of the state. If the restrictions are not removed from said lands, then a sale thereof is expressly prohibited by the proviso of section 6 above quoted. The case of Eaves v. Mullen, 25 Okla. 679, 107 Pac. 433,

involved a guardian's sale of an Indian minor allottee's lands and several irregularities in the procedure resulting in the sale were urged to defeat the title acquired thereby. No personal service of the order to show cause was made upon the next of kin and persons interested; neither was the order of sale published in accordance with the order; nor was the notice of hearing on return of the sale posted the length of time required by the statute. Judgment was rendered for defendants, and this court sustained the judgment upon the ground that the order of confirmation cured the irregularities complained of. The irregularities there, it is true, occurred before the order of confirmation, but the case determined adversely the contentions of plaintiffs for the proposition that a sale which is irregular is void and passes no title, and this view has been followed in Spade v. Morton, 28 Okla. 384, 114 Pac. 724, De Walt v. Cline et al., 35 Okla. 197, 128 Pac. 121, and Sockey v. Winstock, 43 Okla. 758, 144 Pac. 372, all of which involved probate sales of lands of Indian minor allottees. In the decisions cited only one restriction upon the sale of lands belonging to the class here involved has been recognized, and that is that such lands can only be sold through the county court. Should a minor from whose lands restrictions upon the alienation thereof were removed by said act attempt to convey his lands by deed in any manner other than through the county court, his deed would be void. Jefferson v. Winkler, supra; Tirey v. Darneal, supra; Priddy v. Thompson, 204 Fed. 955, 123 C. C. A. 277; Truskett v. Closser. 236 U. S. 223, 35 Sup. Ct. 385, 59 L. Ed. 549; Collins Inv. Co. v. Beard, 46 Okla. 310, 148 Pac. 846; Bell v. Fitzpatrick, 53 Okla. 574, 157 Pac. 334; McKeever v. Carter, 53 Okla. 360, 157 Pac. 56. In Jefferson v. Winkler, it was said:

"It is unnecessary to comment upon the extent or limitation of the authority over the lands and property of such Indians that is by said provision of the Enabling Act reserved to the United States government; for whatever be the extent of that authority or its limitations, we think that it cannot be questioned that such authority reserved is sufficient to retain in the government of the United States jurisdiction over the restricted lands of said Indians to determine and provide how and in what manner such restrictions shall be removed, and that, until such restrictions are removed, the lands of said Indian minor allottees are not within the jurisdiction of the probate courts of the state, with power in said courts to order a sale thereof for any purpose, * * * As before stated, the language of section 1, removing the restrictions upon lands of Indian allottees of less than half Indian blood, if read and construed alone, independent of the other provisions of the act, constitutes

an unconditional removal of ⁂ ⁂ ⁂ restrictions, and renders said allotted lands subject to the control of the said allottees under the law of the state just as other citizens of the state own and control their property. That said section is not to be construed and enforced independent of other sections of the act is clearly manifest by reading sections 3, 4 and 5. ⁂ ⁂ ⁂ Just as the removal of restrictions affected by section 1 upon the lands of both adult and minor allottees of certain classes are limited by the provisions of sections 4 and 5, which render said lands not liable to certain claims or demands against said allottees or subject to certain contracts, deeds, or incumbrances that may have been executed by them, so the removal of restrictions upon the lands of minors is limited by the requirements of section 6 that said property of minor allottees shall be subject to the jurisdiction of the probate courts of the state."

The expression in Tirey v. Darneal, which forms the principal basis for the position of plaintiffs, is not in conflict with the case of Jefferson v. Winkler, supra, for that case involved no probate sale, but the minor had executed a deed direct to the purchaser, and in the light of the facts then presented the holding amounts to this: That the minor's lands could not be sold by him direct, even though all other restrictions had been removed, and that during his minority a valid sale could not be made by him, and that title to the lands of minors could only be obtained by resort to the procedure for the sale of such lands provided by the laws of the state. The power of the probate courts of the state to decree the sale of the lands of minor Indian allottees is dependent upon the fact that the restrictions upon the alienation thereof have been previously removed by act of Congress, and where restrictions have not been removed, a sale of such lands is expressly prohibited. There were no restrictions upon the alienation of plaintiffs' lands other than that they should be subject to the jurisdiction of the probate courts, and the effect of the legislation under consideration was not to make the removal of restrictions dependent upon the exercise of jurisdiction by the court as contended, and when lands of this class are sold under the direction of said court, title would pass if the proceedings were sufficient for that purpose. The legislation of Congress does not undertake to provide the procedure for conducting such a sale, but leaves that entirely to the state law, and the sufficiency thereof must be tested by the laws of the state.

Plaintiffs contend that the sale is void because, (1) the purchase price was not paid in cash before delivery of deeds, and (2) the guardian was the indirect purchaser at his own sale.

Was the payment of the sum bid a condition precedent to the passing of title? The law is well settled that in the absence of specific authority conferred by order of court, a guardian has no authority to sell his ward's lands for anything but cash; and, in case he does, he undoubtedly perpetrates a fraud upon the estate of his ward. If the payment of cash be a condition precedent to the vesting of title, then no rights would pass in any case where anything but cash was received, except where a sale might be authorized upon credit. In McDuffie v. McIntyre, 11 S. C. 551, 32 Am. Rep. 500, a guardian sold a bond and mortgage of his ward for part money and a release of his own debts. The purchaser sought to foreclose his mortgage, and the infants intervened. There was no question of the rights of a bona fide purchaser involved. The application of that case to this is that the court held the facts amounted to fraud, and that the mode of payment was notice to the purchaser. In Wallace v. Brown, 41 Ind. 436, an administrator sold lands of the estate, taking in exchange his own personal notes held by the purchaser. That case involved the sale of lands, and was one where the consideration was not paid in cash. In fact the estate received no consideration whatever. The court treated the case as one of fraud; the right to recover being based upon the allegation that the sale was fraudulent. In sustaining the allegations the court said:

"We think under the facts shown in this case the sale cannot be regarded otherwise than as fraudulent and void. One who knowingly receives from a trustee the trust money or property in satisfaction of the individual debt of the trustee to him must be regarded as participating in the fraudulent diversion of the property, and liable to the beneficiary in the trust. Austin v. Wilson's Administrators, 21 Ind. 252, and cases cited."

And the court declared the law to be that, where a guardian sold the real estate of his ward by order of the proper court, all the proceedings being formal and regular, and received his own individual notes in payment and failed to account to the proper court for the proceeds of the sale, the purchaser may be held accountable for the trust property or its proceeds, if sold by him to an innocent purchaser. Thomasson, Adm'r, v. Brown et al., 43 Ind. 203; Perry v. Blakey, 5 Tex. Civ. App. 331, 23 S. W. 804; Nugent v. Laduke, 87 Ind. 842.

If the view of the plaintiffs be correct, then it would be equally true that no rights would vest where the guardian embezzles the mon-

eys received by him for the sale of his ward's lands, for in that case the estate of the ward receives no benefit, and if the fact that the estate of the wards is not benefited be made the test, then it would make no difference whether the land was sold with the understanding that it should not be paid for, or the guardian failed to collect, or embezzled or misappropriated the consideration received therefor. Where a purchaser at a guardian's sale actually pays the consideration, the fact that the guardian may misapply the same and the estate of the ward receive no benefit from the sale will not defeat the title acquired by the purchaser, if he be innocent himself of any participation therein or wrongful knowledge thereof. Chancellor Kent, in Field v. Schieffelin, 7 Johns. Cr. (N. Y.) 150, 11 Am. Dec. 441, after an elaborate review of the authorities, lays down the rule in the following language:

"I have thus looked pretty fully into the decisions, in the analogous case of a purchase from an executor of the testator's assets, and they all agree in this: That the purchaser is safe if he is no party to any fraud in the executor, and has no knowledge or proof that the executor intended to misapply the proceeds, or was in fact by the very transaction applying them to the extinguishment of his own debt. The great difficulty has been to determine how far the purchaser dealt at his peril, when he knew, from the very face of the proceeding, that the executor was applying the assets to his own private purposes, as the payment of his own debt. The latter and the better doctrine is that in such a case he does buy at his peril, but that if he has no such proof or knowledge, he is not bound to inquire into the state of the trust, because he has no means to support the inquiry, and he may safely repose on the general presumption that the executor is in the due exercise of his trust."

See, also, Mulford v. Beveridge, 78 Ill. 455; Allman v. Taylor, 101 Ill. 193; Woerner, Am. Law of Guardianship, p. 303.

A sale of real estate belonging to an estate, by an administrator or guardian, made in violation of his trust and of the order of court authorizing the sale, is not in the strict sense void, but voidable, and the invalidity of such sale is made to depend, not on the fact that the estate received no benefit, but on the fact that the purchaser was a guilty participant in the wrongful sale, and that his title might be assailed upon the theory that he ought not, in equity and good conscience, profit by his wrongful conduct or by acts of which he had guilty knowledge. The title to lands bought at such a sale may be rendered valid, however, by the failure of the interested parties to have the same set aside in the manner and within the time provid-

ed by law, or before rights of innocent third persons have attached. Burton v. Compton, 50 Okla. 365, 150 Pac. 1080; Heath, Adm'r, v. Layne, 62 Tex. 686; Wyman v. Hooper, 2 Gray (Mass.) 141; Sunter v. Sunter, 190 Mass. 449, 77 N. E. 497; Spurlock v. Spurlock, 161 Ky. 248, 170 S. W. 605.

Plaintiffs rely upon the case of Wallace v. Nichols, 56 Ala. 321, and Woerner's Am. Law of Adm'n, vol. 2, p. 1080, as supporting the opposite conclusion. The text in Judge Woerner's work is based upon the single case of Wallace v. Nichols, which has since been followed in Alabama. In that case the first administrator of the estate of Hughey Nichols, under an order of the probate court, sold certain lands belonging to the estate to one White, who at different times sold portions thereof to other parties. Later a second administrator was appointed, who brought suit against White and his grantees to enforce a vendor's lien against the land. The claim for a lien was sustained. If that sale had been void neither party would have acquired any rights thereunder, and a vendor's lien could not have been predicated thereon. The order of sale directed that the sale be made for one-half cash and one-half in 12 months' time. The sale was in fact made for $1,000; a note for $500 payable 12 months after date being given for the second installment, but the cash payment was not made. Instead White gave his due bill for $500, on which he afterward during the same year paid $250. The sale was reported to the court as having been made in accordance with the order, and that the terms of the sale had been complied with, and was confirmed by the court and deed ordered to be executed, before the balance of the purchase price was paid. Under the laws of Alabama the administrator was entitled to a lien upon the lands sold to secure the payment of the purchase price, and a deed could only be executed after the entire purchase price had been paid. It was apparent from the face of the proceedings that the statute had not been complied with. Upon this state of facts the court held that the administrator had a vendor's lien which might be enforced against the defendants because the grantees of White took with notice of these irregularities. This case, when properly analyzed, is not authority against the views herein expressed. Section 6409, Rev. Laws 1910, is as follows:

"No executor or administrator must, directly or indirectly, purchase any property of the estate he represents, nor must he be interested in any sale."

Section 6565 makes the law regulating sales by executors and administrators applicable to sales by guardians.

In the present case it is conceded that the guardian was the purchaser indirectly at his own sale, but it is claimed on one hand that the mortgagees had no notice of the fact that the purchase price had not been paid, or that the sale to Dillard was in fact for the benefit of the guardian, while on the other hand, the sale is said to be void because in violation of the above statute. The statute is identical with the California statute, and the rule in that state is stated in Boyd v. Blankman, 29 Cal. 19, 87 Am. Dec. 146, as follows:

"A conveyance made by the administrator to himself is ipso facto void, without regard to section 193, for it bears its own invalidity upon its face. But the conveyance to a third person after a sale to him, and a confirmation of the sale, although secretly made for the use of the administrator, gives such person a prima facie title to the land; and the invalidity of the title is made to appear, upon the fact being ascertained and determined in the proper forum, that the purchase was made by the administration per interpositam personam. Before the fact is determined there would seem to be little, if any, doubt that the third person who had taken title for the administrator could pass it to a bona fide purchaser for a valuable consideration without notice of the fraudulent purchase."

The statutes of this state contain no words declaring the sale under such circumstances to be void, and being in the same language as the California statute, the case cited is squarely in point. The decision in Boyd v. Blackman was reaffirmed in Burris v. Kennedy, 108 Cal. 331, 41 Pac. 458, and the distinction made by the court in these cases between a sale by an executor or administrator to himself directly and one in which it is made per interpositam personam is significant in view of the distinction between void sales and voidable sales under which the rights of bona fide purchasers are protected because of a want of knowledge or notice of a secret fraud or defect in the proceedings.

Nevada has a statute similar to Oklahoma, and in the matter of the Estate of Marco Millenovich, 5 Nev. 161, the court used the following language:

"The next complaint made against the executor is, that he was interested in the purchase of the property in San Francisco saloon belonging to the estate. This is expressly prohibited by the statute; and if the court were satisfied that it were so, it might have declared the sale absolutely void—if third parties would not be affected—and ordered all the profits made from the retail sale of the liquors to be paid to the estate."

In the case of Melms v. Pabst Brewing Co., 93 Wis. 153, 66 N. W. 518, 57 Am. St. Rep. 899, the court considered a statute which de-

clared a sale in which the administrator or guardian was the purchaser directly or indirectly void, and in the opinion said:

"If the statute should be so construed as to avoid sales by executors, administrators, and guardians on the ground stated, or for secret frauds, as against innocent purchasers for value, title founded upon them would be so doubtful and uncertain that few would care to purchase or pay a fair price for them. We think that the word 'void' was used in the statute in the sense of voidable."

A statute very similar to that involved in the Wisconsin case was construed by the Supreme Court of Nebraska in Veeder v. McKinley-Lanning Loan & Trust Co., 61 Neb. 892, 86 N. W. 982, under very similar circumstances, in the following language:

"To give the section quoted a liberal construction, and hold the sale made by the administrator, and the deeds in pursuance thereof, void and of no force and effect, in the strict legal sense of the term would end the discussion of the case, and render further consideration unnecessary. If the sale is void in toto, and not merely voidable, the titles acquired by the defendants by their subsequent conveyances must fall to the ground, and leave them without standing upon which to base the relief demanded. Whether the section shall be so construed may be said to be an open question in this state. Whether the Legislature intended that a sale so made should be utterly void may not be entirely free from doubt. It has been frequently and well said that the terms 'void' and 'voidable' are frequently used interchangeably, and that the word 'void' is often so used when the act so characterized is intended to be voidable only. It may, we think, be well doubted whether the Legislature intended that a sale made in the manner condemned by the section quoted should be, for all purposes, void, as though it never had taken place."

The court placed their decision upon the ground that the sale under the circumstances was voidable only, and that those who claimed rights subsequent to the voidable sale with notice of the facts and not as good-faith grantees or mortgagees were affected by the acts upon which the same might be declared void.

The Supreme Court of Minnesota construed the statute of that state which declared such purchases to be void in White v. Iselin, 26 Minn. 487, 5 N. W. 359, and held that a purchase by a guardian at his own sale through another was voidable and not void. People v. O. B. S. B. B. Co., 92 N. Y. 98; Otis v. Kennedy, 107 Mich. 312, 65 N. W. 219; Burns v. Cooper, 140 Fed. 273, 72 C. C. A. 25.

Under the general principles of chancery a sale by an administrator or guardian to himself through the interposition of a third per-

son is voidable only, and not void. Such a sale and conveyance passes the estate, liable, however, to be defeated by the heirs or wards, as the case may be. But this may only be done as against the administrator or guardian or one claiming under him with knowledge of the circumstances of the sale or in the hands of a purchaser who is not a bona fide purchaser upon good and sufficient consideration and without notice. Mitchell v. Mullen, 59 Mo. 252; Wyman v. Hooper, 2 Gray (Mass.) 141; Sunter v. Sunter, 190 Mass. 449, 77 N. E. 497; Burns v. Cooper, 140 Fed. 273; Gwinn v. Williams, 30 Ind. 374; Blake v. Blake, 260 Ill. 70, 102 N. E. 1007; Kazebee, v. Nunemaker, 82 Neb. 732, 118 N. W. 646; Spurlock v. Spurlock, 161 Ky. 248, 170 S. W. 605; Gibson v. Herriott, 55·Ark. 85, 17 S. W. 589, 29 Am. St. Rep. 17; Woerner, Am. L. Adm. (2d Ed.) vol. 2, p. 1184; Woerner, Am. L. Guardianship, p. 297.

Under the foregoing authorities the correct rule would appear to be in cases where a sale is made by a guardian or administrator to another person with a secret understanding that the lands should be afterwards conveyed to the guardian or administrator, and the proceedings are in every respect regular upon their face and there is nothing upon the record to apprise third persons dealing with said purchaser of said secret agreement, while these facts would constitute a fraud by the guardian upon the estate of his ward, yet all persons dealing with said purchaser in good faith and paying a valuable consideration for rights acquired by them would be protected, for it follows as a logical conclusion from the reasoning of the cases that such sale is vacated, not because the estate failed to realize anything from the sale, but because the purchaser or incumbrancer participated in the guardian's fraud or had knowledge thereof.

The case of Burton v. Compton, 50 Okla. 365, 150 Pac. 1080, is said to be in conflict with these views. The sale in that case was held to be void because the guardian's wife was the purchaser at the sale, and the identity in the names of the guardian and the purchaser, together with other facts, was held to give the purchaser from her actual notice of the channel through which she claimed title and of the relationship existing between her and the guardian, and that he was not an innocent purchaser. Wood v. French, 39 Okla. 685, 136 Pac. 734, involved a deed executed by the grantee in a deed which had been placed in escrow and afterwards fraudulently obtained by him. It was held that wrongfully obtaining possession of such deed without performance of the conditions as security for which it had been

placed in escrow did not pass the title and therefore the grantee therein named could convey none. Wellsville Oil Co. v. Miller, 44 Okla. 493, 145 Pac. 344, involved an oil and gas lease which had been executed to the oil company upon the condition of securing approval thereof by the Secretary of the Interior. The suit was one to validate the lease and to cancel a like lease held by another. The United States courts had held that the Secretary had no authority to examine and approve such leases, and it was contended that this portion of the order was surplusage. This contention was denied, and the condition held to be a condition precedent. The question of the rights of an innocent purchaser was not involved, and had it been, the condition was apparent on the face of the record.

There is a public policy in protecting the rights of bona fide purchasers and incumbrancers, as well as in protecting wards and heirs against fraud, and the courts have leaned strongly towards the protection of rights acquired by bona fide purchasers and incumbrancers in probate sales asserted to be fraudulent for reasons not apparent upon the face of the record, but said to exist by reason of some secret agreement upon the part of the administrator or guardian. The statute gives protection to the ward in such cases by requiring the guardian in the first instance to give a bond for the faithful performance of his duties as such, and, upon decreeing the sale of lands belonging to his wards, requiring the execution of an additional bond, conditioned to sell the same in the manner and to account for the proceeds of the sale as provided by law. Section 6564, Revised Laws 1910. Strong reasons have impelled the courts to declare this policy; for·if the rule were otherwise, and sales by administrators and guardians were liable to be defeated by proof·of secret agreements between an administrator or guardian and the purchaser thereafter, which are not disclosed by the record and cannot be ascertained by such an investigation as would ordinarily be made by a reasonably prudent person, where the proceedings appear in every respect to be regular and the sale has been approved by the court, no person could afford to pay for such lands a sum commensurate with their value, and titles thereby acquired would be rendered practically unmarketable, and the estate could never realize at such sales the fair value of the property sold. On the other hand, if such sales which are perfectly fair on their face and appear to have been conducted according to law and have been approved by the court are held to be good as against a claim of fraud, arising out of such secret understanding, stability will be given to such titles.

and purchasers using proper caution will be induced to pay a fair value for such lands. Boyd v. Blankman, 26 Minn. 487; White v. Iselin, (Minn.) 5 N. W. 359.

Application for the loan was taken by one L. W. Tarkenton, who was local agent of the investment company at Waurika, and forwarded to its Oklahoma City office, where the necessary papers were prepared and forwarded to Tarkenton, to secure their execution by Dillard. After these papers had been executed under the supervision of Tarkenton, check for the amount of the loan was sent to him and by him delivered to Dillard. The amount bid for the lands at the guardian's sale was not paid, and plaintiffs claim that Tarkenton had knowledge of this fact, and that knowledge by him was notice to the investment company. The jury found in answer to special interrogatories that Tarkenton had knowledge of the relations of Dillard to the sale, and that none of the managing officers of the company had any such knowledge. The court, in its judgment, found that Tarkenton was the agent of the company for certain purposes, and that he had knowledge of the fraud in connection with the sales, but held that the investment company had no notice of such fraud, and that it should not be charged with notice thereof by reason of the notice to Tarkenton, because the scope of his agency was limited so that notice to him would not be imputable to the company and to E. E. Ford. Right here it may be stated that the mortgage of Ford was in fact for the benefit of the company, and represented the commissions charged for the loan, and would be affected the same as the mortgage to the company.

Plaintiffs contend that notice to Tarkenton was notice to the company, while defendants insist that his agency was so limited that the notice acquired by him was not acquired within the scope of his authority, and would not therefore be notice to them, and they further urge that the verdict of the jury and the finding of the court upon this point are not supported by the evidence. The sufficiency of the evidence upon this point is not properly challenged by defendants, and we shall therefore assume the facts found to be true.

The rule as to notice or knowledge possessed by the agent which is imputed to his principal is stated in U. S. Fidelity & Guaranty Co. v. Shirk et al., 20 Okla. 576, 95 Pac. 218, as follows:

"The law imputes to the principal, and charges him with all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or which he may previously

have acquired, and which he then has in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it." First State Bank of Keota v. Bridges, 39 Okla. 355, 135 Pac. 378.

Defendants say that Tarkenton had no authority to pass upon the security offered for the loan nor the title to the property, and therefore the knowledge acquired by him was not within the scope of his authority, and should not be imputed to the company.

In Land Mortgage Inv. Agency Co. v. Preston, 119 Ala. 290, 24 South. 707, the agent of the borrower had made application for a loan, which was accepted, and the lender authorized said broker to pay the money over to the borrower, and it was held that the broker was the agent of the lender for the purpose of paying the money over, and that the lender was responsible for the act of the broker in paying the money over to a person not authorized to receive it.

The case of Bates v. American Mortgage Co., 37 S. C. 88, 16 S. E. 883, 21 L. R. A. 340, is one very similar in fact and principle to the present case. The American Mortgage Company of Scotland, Limited, was engaged in lending money through the medium of the Corbin Banking Company, which latter company was engaged in the business of negotiating loans on real estate security in the Southern States, for foreign corporations. The company sought and effected these loans by and through their agents at different points, to whom they furnished printed blanks for making application for loans. They fixed the terms, examined and approved the securities offered, and looked after the collection of the securities for those persons for whom they acted and made loans. W. H. Duncan was the local agent of the Corbin Banking Company, and the application contained a statement that said Duncan was agent for the borrower. The money was borrowed by a married woman, and was to be used by her husband for paying his personal debts. Under the laws of that state a married woman's real estate could not lawfully be incumbered unless it was for the benefit of her separate estate. Duncan had knowledge of these facts, and it was held that notice to him was notice to both the Corbin Banking Company and the Mortgage Company, and judgment of the trial court canceling the mortgage was affirmed. Russell v. Peavy (Ala.) 32 South. 492.

In the present case the facts upon this point are undisputed, and it is clear from the record that Tarkenton was acting as agent for the defendants when procuring the application for the loan and the execution

of the notes and mortgages 'and at the time of paying over the proceeds of the loan to Dillard, and that notice to him of the fraud in the sales was notice to his principal, and, when delivering the check, he then had it in his power, in view of this knowledge, to withhold same and save his principal' harmless. Not having done so, and having paid the same over with notice of the facts, he did so at the peril of his principal. McLean v. Ficke et.al., 94 Iowa, 283, 62 N. W. 753; Jensen et al. v. Lewis Inv. Co., 39 Neb. 371, 58 N. W. 100; Matteson v. Blackmer, 46 Mich. 393, 9 N. W. 445; Mortgage Co. v. Gillam, 49 S. C. 345, 26 S. E. 990, 29 S. E. 203; Stockton et al. v. Watson et al., 101 Fed. 490, 42 C. C. A. 211.

The order of the county court made in the probate proceedings authorized a sale of the lands of plaintiffs for cash, to be paid upon confirmation of the sale and the execution and delivery of guardian's deeds. The first mortgage to the Deming Investment Company bears date of September 10, 1912, just six days before the order of confirmation and before the execution and delivery of guardian's deeds. Both mortgage and deeds were filed for record on the same day, September 17th. Upon the face of the record at the time of the execution of the first mortgage the investment company had notice that the sale had not been confirmed and deeds had not been executed and the consideration had not been paid. The manager of the company testified that loans were approved before the execution of mortgages, and therefore at the time the loan was approved the record disclosed the fact that the purchase price had not been paid. On September 28th another mortgage was executed, and on October 26th release of the first mortgage was filed for record. The second mortgage was executed in lieu of the first because the borrower could not give good title to ten acres of the land embraced within the first, and this ten acres was omitted and the loan reduced to $1,900. The company, therefore, at all times had record notice that the purchase price of the lands had not been paid.

In La Dow v. North American Trust Co. et al. (C. C.) 113 Fed. 13, plaintiff, who was a minor, owned a one-half interest in certain lands, the other half being owned by his brother. His mother was guardian of his estate, and conspired with his brother and another to raise money by mortgaging the estate. The guardian petitioned to sell the property, and a few days thereafter she, with the brother and third party, joined in a mortgage of such land. Nearly two months thereafter a pretended guardian's sale of plaintiff's interest was made to such third

party, subsequently confirmed, and a guardian's deed made to him. He paid no consideration, and subsequently he, with plaintiff's mother and brother, without consideration, conveyed to another, who conveyed to defendant's son, who was her attorney in fact, and assumed a part of the mortgage and afterwards conveyed to her. The evidence was indefinite as to what, if any, consideration was paid by defendant's son, and also conflicting as to whether he was fully informed as to the nature of the transactions and of plaintiff's rights. The mortgage was subsequently adjudged invalid by the state Supreme Court. It was held that defendant's son and grantor was charged with notice that the pretended purchaser at the guardian's sale had joined in the mortgage before the sale, and that there was no necessity for both the mortgage and sale to meet the minor's requirements as shown by the petition for the sale, and that by his assumption of a part of the mortgage he became a party to the illegal transaction. Upon rehearing it was held that where a pretended purchaser at a guardian's sale pursuant to a scheme to raise money on the property executes a mortgage thereon before the sale, it being understood that he will reconvey the property to the ward, but instead conveys to another, the transaction is so unusual that a subsequent grantee cannot rely upon the record as rebutting the inference of fraud arising from the mortgage being so executed.

In the case at bar Tarkenton, the agent of the investment company, had actual knowledge and notice of the fraudulent agreement between the guardian and Dillard to reconvey to the guardian, and also of the agreement that Dillard should pay no consideration for the land, and this notice was imputable to the investment company. In addition, the fact that a mortgage was executed on said lands by Dillard six days before the guardian's sale to him was confirmed and deed executed was so unusual as to put a reasonably prudent man upon inquiry as to what rights Dillard owned in the premises and as to the rights of the minors therein at that time. However, we need not place our decision in this case upon that ground alone, as we have seen that the investment company, through its agent, Tarkenton, had actual notice and knowledge of the fraud connected with the sale.

The judgment is therefore reversed, and the cause remanded. All the Justices concur, except KANE, C. J., absent.

## ON REHEARING.

HARDY, J. Counsel criticize the court for failure to decide the question of fact concerning the limitation upon Tarkenton's au-

thority and for failure to pass on the legal effect of such limited authority. The original opinion shows that the trial court found Tarkenton's authority to be limited, and that by reason of such limitation thereon, knowledge acquired by him would not be notice to his principal, and after stating the contention that the verdict of the jury and findings of the court were not supported by the evidence, it was held that the sufficiency of the evidence upon this point was not properly challenged, and the facts found were therefore assumed to be true. By this, the court treated as a fact the limitation upon Tarkenton's authority which had been found to exist by the trial court; but since counsel do not consider this sufficiently specific, we now express the opinion, and so find, that Tarkenton had no authority to finally fix the terms of the loan; neither was he authorized to appraise the security offered nor pass upon the applicant's title to that security.

The second ground of complaint, that the court failed to pass on the legal effect of Tarkenton's limited authority, is without merit, for it was held that, notwithstanding the limited authority possessed by him, yet because of his knowledge of the fraudulent character of the sale, notice thereof was imputed to Ford and the Deming Investment Company. Counsel have outlined the plan of business pursued by the Deming Investment Company, from which it appears that applications for loans are usually secured and submitted to the company by a local agent such as Tarkenton was in this case. The application is in writing, and contains such information as the company requires to enable it to pass upon desirability of making the loan. An abstract showing the condition of the record concerning the title of the applicant to the property offered as security is submitted with the application. For the purpose of securing this application Tarkenton was admittedly the agent of the investment company, and was the medium through which it obtained the information contained therein. It would not be questioned for a moment if the principal should take the application that knowledge of fraud vitiating the sale, acquired in so doing, would defeat the claim of being an innocent incumbrancer, and likewise such information secured by a duly authorized agent, while performing the duties intrusted to him, would be equally effective. Having furnished him with blanks to secure the information desired, it was within the scope of his authority to acquire all such information, and it was his duty to communicate same to his principal and a failure upon his part to discharge this duty does not prevent notice thereof being imputed to his principal. The fact that the abstract was referred to counsel for an opinion upon the legal sufficiency of the applicant's title to the property offered as security does not change the situation. Neither does the fact that after the loan was approved notes and mortgages were prepared in blank and forwarded to Tarkenton for the purposes of securing the due execution thereof by the borrower and returning them to the company, nor that draft for the amount of the loan made payable to borrower was sent to Tarkenton for delivery.

The contention of defendants in error simply means this: That it was not within the scope of the local agent's authority to acquire information which would tend to show that the applicant did not have good and sufficient title to the property upon which the loan was desired. If this position be tenable, then the Deming Investment Company has built up a system of transacting its business that renders it impervious to notice of any fact which affects adversely the title to property upon which a loan may be desired, for knowledge of the local agent who takes and transmits the application would not impute notice to the company. The attorney who passes upon the abstract, not being charged with the duty of obtaining such information, would ordinarily not acquire such knowledge, and if he did know such facts, his knowledge would not be notice to the company, and so on through every step of its business. Thus the investment company could, by the failure of its local agent to communicate knowledge of any fact other than that which would tend to show title in the applicant, assert a claim, as is here done, of being an innocent incumbrancer, and would not be charged with responsibility for any knowledge acquired by its agent, except where it is for their interest and profit to do so. This position cannot be maintained.

In all of the cases relied upon by defendants in error, it was held that knowledge of facts acquired by the agent not acting within the scope of his authority could not be imputed to his principal. From this general statement of the law, there can be no dissent. The distinction between those cases and the facts here involved is that the knowledge acquired by Tarkenton was acquired by him while acting within the scope of his authority, or which had been so recently acquired by him previous to the time of taking the application and performing the other duties intrusted to him as to reasonably warrant the assumption that he still retained it and was under obligation to communicate such knowledge to his principal.

The petition for rehearing is overruled.

All the Justices concur.